IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PHILLIP L. HERCZECH,

      Petitioner,

v.                               CIVIL ACTION NO. 3:12cv140
                                   (Judge Groh)

TERRY O'BRIEN, Warden

      Respondent.

## REPORT AND RECOMMENDATION

### I. BACKGROUND

On November 29, 2012, the *pro se* petitioner, an inmate at USP Hazelton in Bruceton Mills, West Virginia, filed an Application for Habeas Corpus Pursuant to 28 U.S.C. § 2241, in which he seeks an order expunging his disciplinary record and restoration of his Good Time Credits. On November 30, 2012, the petitioner was granted leave to proceed *in forma pauperis*. By Order entered November 30, 2012, the court directed the respondent to show cause why the petition should not be granted. On January 9, 2013, the respondent filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment. On January 14, 2013, a Roseboro Notice was issued. To date, the petitioner has made no reply.

### II. FACTS

The petitioner is a federal inmate committed to the custody of the BOP serving a 51-month term of imprisonment for bank robbery. See 3:09cr2091-JAH-1 available on PACER. Although the petitioner is currently designated to USP Hazelton, the disciplinary proceedings about which he

1

complains occurred while he was designated to USP Victorsville in Adelanto, California. The petitioner's projected release date is October 15, 2013. (Doc. 22-2, p. 2).

On February 10, 2011, the petitioner was designated to the United States Penitentiary ("USP") at Victorsville in Adelanto, California to serve 51 months for bank robbery. (Doc. 22-1, p.2). On 14, 2011, the petitioner presented to staff physician Jesus Fernandez for a chronic care visit with a history of bipolar disorder and schizophrenia. (Doc. 1-13, p.7). Dr. Fernandez noted that the petitioner's mood was erratic but that he was not suicidal. (Id.). Dr. Fernandez renewed the petitioner's prescription for Lithium Carbonate for his bipolar disorder. (Id. at 10).

On February 24, 2011, the petitioner presented to staff psychiatrist Ikechukwin Ohiaeri who noted that the petitioner reported "he goes for days not taking his medications, as he did not want to stand in line with some other inmates to get his medication." (Doc.1-14, p.5). On June 21, 2011, the petitioner presented to staff psychiatrist James Wolfson who noted that the petitioner admitted he had taken "exactly none of the several medications prescribed for him" because "he can't stand, and thus won't, go to pill line." (Doc.1-15, p.2).

On September 1, 2011, while housed in the general population, the petitioner attempted suicide by ingesting several different types of unknown medications. (Doc.1-7, p.5). Staff psychologist Karen D. Ray advised that upon his return from the hospital the petitioner should be placed on suicide watch pending an evaluation. (Id.). On September 2, 2011, Ray recommended that the petitioner's suicide watch should be canceled "[g]iven [his] history of manipulation and his self-report of resumed mental stability...." (Id. at 6). When asked why he ingested pills, the petitioner reported that he was angry with Dr. Fernandez for discontinuing his medication and at his unit team because of a recent transfer denial. (Id.).

On September 4, 2011, while housed in the general population, the petitioner attempted

2

suicide by ingesting approximately 15 pills of Zantac. (Doc.1-7, p.2). Once he returned from the hospital, the petitioner was evaluated by Dr. Ray. (Id.). Although Dr. Ray found the petitioner to be "enjoy[ing] the attention he was getting and intentionally acting 'crazy," she determined him to be a moderate suicide risk and placed him on suicide watch "[g]iven the two suicidal gestures in the three days...." (Id. at ). Again the petitioner reported that he had ingested pills because he was angry with Dr. Fernandez for discontinuing his medication. (Id. at p.3).

On September 8, 2011, the petitioner presented to Dr. Fernandez who noted that the petitioner had been found to be manipulative and that the petitioner had actually confirmed his behavioral outbursts were motivated by childlike temper tantrums.(Doc.1-13, p.4). Dr. Fernandez further noted that the petitioner appeared to have a high level of function and that the petitioner definitely knew the difference between right and wrong. (Id.). Dr. Fernandez noted that the petitioner was "truly not suicidal" and that the petitioner made outright comments on how he 'manipulates' [sic] peoples [sic] conduct." (Id.). Dr. Fernandez also found "no clear evidence" of auditory, visual, olfactory, or persecutory hallucinations. (Id.) As a result, Dr. Fernandez discontinued the petitioner's prescription medicines, including Benadryl, Haldol and Respiridol. (Id. at pp. 4-5).

On September 9, 2011, at 7:35 a.m., the petitioner was found in his Special Housing Unit ("SHU") cell strangling himself with a sheet. (Doc.22-4). At 7:49 a.m., the petitioner presented to staff physician assistant Bridgitte Wolverton in the SHU for an injury of assessment.(Doc. 1-5, p.2). The petitioner was given an injection of Benadryl. (Id. at 3). PA Wolverton noted that the petitioner "calmed down significantly while in the SHU after all the officers left." (Id.).At this time, the petitioner was also evaluated by staff psychologist Joselito G. Faustino to be "alert and oriented in all spheres."(Doc. 1-9, p.2). When asked about the reason for the suicidal gestures, the petitioner "complained that he was frustrated that Dr. Fernandez discontinued all of his medication."(Id.). The

3

petitioner "repeatedly" denied suicidal ideation and explained that this gesture was his "means of gaining staff attention to his needs and demands which included a 'King James Bible', pad and pencil to write his thoughts." (Id.). As such, Dr. Faustino assessed the petitioner as having a "tendency to act out impulsively and erratically to demand things he cannot obtain outside his control." (Id.). Accordingly, Dr. Faustino determined the petitioner to be a low suicide risk and concluded that suicide watch was not warranted.(Id.).

Later the same day, at 4:30 p.m., the petitioner was found in his SHU cell strangling himself with a piece of plastic. (Doc. 22-9). At 6:25 p.m., the petitioner presented to staff registered nurse Daniel Santos complaining of a headache from hitting his head on his cell door.(Doc. 1-10, p. 2). At 7:15 p.m., Lieutenant ("Lt.") V. Lisenko delivered the petitioner Incident Report No. 2208602 charging him with self-mutilation arising from the incident at 7:35 a.m. (Doc.22-4). This incident was later investigated by Lt. J. Franklin who referred the incident report to the Unit Discipline Committee ("UDC"). (Id. at 2). The reporting officer was Senior Officer Specialist J. Garcia. (Id. at 1).

On September 10, 2011, and 8:25 a.m., the petitioner was found hitting his head against the wall in the SHU observation room. (Doc.22-13). At 2:47 p.m., the petitioner presented to PA Wolverton in the SHU where he refused Haldol, stating that he was allergic. (Doc. 1-12, p.2). The petitioner was instead given an injection of Ativan, which is used for short-term treatment of anxiety. (Id. at 3). The petitioner was again evaluated by Dr. Faustino who made the same findings as the day before, determined that petitioner to be a low suicide risk, and concluded that suicide watch was not warranted. (Doc. 1-13, pp. 2-3).

On September 10, 2011, at 5:30 p.m., Lt. Lisenko delivered the petitioner Incident Report

No. 220-8872 charging him with self-mutilation arising from the incident at 8:25 a.m. and commenced an investigation which he concluded at 6:00 p.m. by referring the instant report to the UDC. (Doc. 22-13). The original reporting officer was Senior Officer R. Haight. (Id.).

On September 10, 2011, at 6:20 p.m., Lt. M. Jenson delivered the petitioner Incident Report No. 2208885 charging him with self-mutilation arising from the incident the previous day at 4:30 p.m. (Doc.22-9). Activities Lt. D. McKinley then commenced an investigation which he completed at 6:45 p.m. by referring the incident report to the UDC. (Id at 2). The original reporting officer was Lt. Lisenko. (Id. ). On September 12, 2011, Dr. Ray performed a crisis intervention evaluation of the petitioner at his SHU cell. (Doc. 1-6). Dr. Ray later noted that "[u]pon approaching the cell to speak to the inmate, he initially became agitated and banged his head into the glass in front of me stating 'Man, that hurts.'" (Id. at 2). Once Dr. Ray explained that she was there to help the petitioner,[h]e then went on to make a flurry of requests such as 'I need my medication! I need a shot!, 'I want to go back to the compound','I want my clothes, I'm cold!'" (Id.). Dr. Ray then 'made an effort to contact the physician regarding the medication requests without success so [she] contacted the [associate Warden] regarding the issues" and it was "confirmed at that time that the inmate would not be returning to [the general population] and would need to be transferred." (Id.). When Dr. Ray returned to the cell and advised the petitioner what she had learned, he "agreed to calm down and not cause any more problems if he could get a 'haldol shot', be put in a cell where he could use the toilet and take a shower, and staff would try to expedite his transfer." (Id.)

On September 13, 2011, the petitioner presented to Dr. Fernandez who again discontinued his medication: "At this time I have requested to all providers that all meds are to be stopped since the benefits of these drugs does [sic] not outweight [sic] the [sic] risk of overdose hording [sic] and inherent dangers." (Doc. 1-13, p. 6).

5

On September 12, 2011, the UDC reviewed the 3 incident reports once a staff investigation was complete and referred all 3 reports to the Disciplinary Hearing Officer ("DHO") for hearings based upon the severity of the incidents. (Docs. 22-4; 22-9; 22-13). The same day, the petitioner was given a Notice of Discipline Hearing before the DHO and an Inmate Rights At Discipline Hearing for each of the three incident reports. (Docs. 22-5; 22-6; 22-10; 22-11; 22-14; 22-15). The petitioner indicated that he wanted staff representation but that he did not wish to call any witnesses. (Id.).

On September 13, 2011, DHO Jon Adduci sent an e-mail to Dr. Faustino advising him of the petitioner's three incident reports and "requesting a determination whether the inmate is responsible and/or competent." (Doc. 22-8). On September 14, 2011, DHO Adduci conducted hearings on all 3 incident reports.(Doc. 22-1, pp. 3-6). On September 19, 2011, Dr. Faustino sent DHO Adduci a reply e-mail stating: "He is FULLY COMPETENT and has full understanding of his behavior and their consequences. He has been diagnosed with MALINGERING and tends to utilize this malingering behavior to get his demands met." (Doc. 22-8).

On September 20, 2011, DHO Adduci completed three DHO reports to record the hearings and his decisions. (Docs. 22-7; 22-12; 22-16). DHO Adduci concluded that on each occasion the petitioner had committed the prohibited act of self-mutilation, and sanctioned the petitioner to disallowance of good conduct time of 27 days and loss of commissary privileges for two months. (Id.). In each of the DHO reports, DHO Adduci noted that at the hearings the petitioner confirmed he had received the instant reports, he did not want to call any witnesses, he had no documentary evidence, he waived his right to a staff representative, and he was ready to proceed. (Id.).

In the DHO report arising from the first incident, DHO Adduci outlined the evidence upon which he relied as follows:

> The DHO relies upon the reporting officer's statement which
> indicates on September 9, 2011, at approximately 7:35 a.m.,

6

>   staff observed inmate HERCZECH's window covered up.
>   Upon opening his food trap, inmate HERCZECH was found
>   to be lying in bed unresponsive with a long piece f cloth tied
>   around his neck. Inmate HERCZECH began to manually
>   strangle himself and refuse orders to stop. Upon the arrival of
>   additional staff inmate HERCZECH submitted to hand restraints.
>
>   The DHO relies upon the statement HERCZECH made at his DHO
>   hearing, in which he admits to the charge.
>
>   The DHO relies upon the statement of Dr. Faustino which indicates he has
>   determined the inmate is competent and responsible.

(Doc. 22-7, p.2).

In the DHO report arising from the second incident, DHO Adduci outline the evidence upon which he relied as follows:

>   The DHO relies upon the reporting officer's statement which
>   indicates on September 9, 2011, at approximately 4:30 p.m., the
>   reporting officer saw inmate HERCZECH place a piece of plastic
>   around his neck in an attempt to choke himself. HERCZECH was
>   ordered to stop and to submit to hand restraints at which point he did.
>   HERCZECH was removed from Cell 150 to be evaluated; when he was
>   placed back in Cell 150 he began to bang his head on the wall vigorously
>   about ten to fifteen times. He was medically assessed and placed on
>   suicide watch for his own safety.
>
>   The DHO relies upon the statement HERCZECH made at his DHO hearing,
>   in which he admits to the charge.
>
>   The DHO relies upon the statement of Dr. Faustino which indicated the
>   inmate is considered competent and responsible for his actions.

(Doc. 22-12, p.2)

In the DHO report arising from the third incident, DHO Adduci outline the evidence upon which he relied as follows:

>   The DHO relies upon the reporting officer's statement which
>   indicates on September 10, 2011, at approximately 8:25 a.m.,
>   staff observed inmate HERCZECH hitting his head against the
>   wall and windows of ...observation room number one. The reporting

> office[r] went and attempted to talk to an inmate HERCZECH.
> HERCZECH kept stating, "I am phase three and I will continue
> mutilating myself." The reporting officer then asked what phase three was
> and inmate HERCZECH stated, "Self-mutilation." Inmate HERCZECH
> then continued to beat his head against the window, at which point
> his head started bleeding. The reporting officer then notified the
> Lieutenant.
>
> The DHO relies upon the statement inmate HERCZECH made at his
> DHO hearing, in which he admits to the charge.
>
> The DHO relies upon the statement of Dr. Faustino which reveals
> he determined the inmate is competent and responsible for his actions.

(Doc. 22-16, p.2).

On October 2, 2011, the petitioner appealed each of the DHO decisions to the Regional Office. (Docs. 22-19; 22-20; 22-21). The petitioner claimed that the DHO had improperly relied upon Dr. Faustino to find him responsible for his behavior and competent to participate in the hearing because Dr. Faustino had not evaluated him since the incident. (Id.).

On October 27, 2011, the Regional Office rejected the petitioner's claim and denied each of the appeals, finding that it was not improper for DHO Adduci to base his competency/responsibility decision upon the opinion of Dr. Faustino and that the petitioner had otherwise received all process due an inmate in disciplinary proceedings. (Id.).

On January 17, 2012, the petitioner appealed all three decisions of the Regional Office to the Central Office. (Id.). On October 26, 2012, the Central Office denied the appeals finding that the Regional Office had adequately addressed the petitioner's claim that he was neither responsible nor competent. (Id.).

### III, CONTENTIONS OF THE PARTIES

In his court-approved form, the petitioner alleges three grounds for relief. All three grounds challenge each of three DHO reports for the same reason: the petitioner claims that the DHO should

have declined to take disciplinary action and instead found him not responsible for his behavior because the medication treating his schizophrenia and bipolar disorder had been discontinued, and thus, the DHO should have also found that he was not competent to participate in the hearing. In the 46-page handwritten brief attached to his court-approved form, the petitioner appears to allege five additional grounds for relief. In what would be Ground Four, the petitioner challenges one of the incidents reports because it was not delivered to him within 24 hours of the incident. In what would be Ground Five, the petitioner challenges another incident report because the same officer who delivered the report to him also investigated the report. In what would be Ground Six, the petitioner challenges all three incident reports because the UDC allegedly did not provide him with copies of its decisions to refer the incident reports to the DHO. In what would be Ground Seven, the petitioner challenges all three of the DHO decisions because he was allegedly denied the opportunity to present documentary evidence in the form of his medical records to show that his medication had been discontinued. In what would be his Eighth Ground, the petitioner alleges that he was denied staff representation that could have retrieved the medical records.[1] For relief, the petitioner seeks expungement of the DHO decisions and restoration of the good conduct time disallowed.

In response to the petition, the respondent maintains that the petition should be dismissed because: (1) the petitioner failed to exhaust his remedies on every ground for relief except Grounds One, Two and Three; (2) the petitioner was afforded the process due a federal inmate in disciplinary proceedings; and (3) the DHO properly based his competency/responsibility decision upon the opinion of a staff psychologist who had evaluated the petitioner immediately following the incidents and just days before the hearing.

---

[1] As discussed more fully in Section V of the Report and Recommendation, the petitioner has received the due process required by Wolf v. McDonnell, 418 U.S. 339 (1974). Accordingly the undersigned has declined to address each individual claim made by the petitioner.

## IV. STANDARD OF REVIEW

### A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v.

Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

### B. SUMMARY JUDGEMENT

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment motions in habeas cases. See Blackledge v. Allison, 431 U.S. 63, 80 91977). So too, has the Fourth Circuit Court of Appeals. Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242-252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must

consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 587-88 1986).

## V. ANALYSIS

**A. The Petitioner Received Due Process Afforded Pursuant to Wolff**

Prison disciplinary proceedings are not criminal prosecutions, and prisoners do not enjoy "the full panoply of due process rights due a defendant in such [criminal] proceedings. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Where, as here, a prison disciplinary hearing may result in the loss of good time credit, Wolff holds that due process requires the following:

1. giving the prisoner written notice of the charges at least 24 hours before he appears for his disciplinary hearing;

2. providing the prisoner a written statement by the fact finders as to the evidence relied on and reasons for the disciplinary action;

3. allowing the prisoner to call witnesses and present documentary evidence in his defense, when permitting him to do so will not be an undue hazard to institutional safety or correctional goals;

4. permitting the prisoner the aid of a fellow prisoner, or if that is forbidden, aid from staff or a competent inmate designated by staff, if the prisoner is illiterate or the complexity of the issue makes it unlikely that the prisoner will be able to collect and present the evidence necessary for an adequate comprehension of the case; and

5. providing impartial fact finders.

Id. at 564-571. The information before the Court reveals that the petitioner was provided due

process as contemplated by Wolff.

First, the petitioner received written notice of the charges at least 24 hours in advance of the DHO hearing. More particularly, the petitioner received a copy of Incident Report Number 2208602 on September 9, 2011 at 7:15 p.m., and the DHO hearing was held on September 14, 2011. (Doc. 22-7, p.1). In addition, the petitioner received a copy of incident report number 2208885 on September 10, 2011 at 4:30 p.m., and the DHO hearing was held on September 14, 2011. (Doc. 22-12, p.1).Finally, the petitioner received a copy of Incident Report Number 2208872 on September 10, 2011 at 5:30 p.m., and the DHO hearing was held on September 14, 2011. (Doc. 22-16, p.1).

Second, the petitioner was provided a written statement by the DHO as to the evidence relied upon to find that he had committed Offense 228, Tattooing or Self-Mutilation and the reasons for the disciplinary action. The DHO reports for each incident indicate that the DHO relied on the reporting officer's statement, the statement made by the petitioner at each hearing in which he admitted the charge, and the statement of Dr. Faustino which indicated that the petitioner was competent and responsible. (Docs. 22-7, p.2; 22-12. p.2; 22-16, p.2) With respect to the reasons that sanctions were imposed, the DHO in each report stated that:

> Any action on the part of any inmate to self-mutilate himself may cause serious injury to him, and hinders the ability of staff to manage inmates. The disallowance of good conduct time was imposed based on the severity level of the prohibited act, and the inmate's sentence commitment. Other sanctions were given to serve as a punishment

(Docs. 22-7, p.2; 22-12, p.2; 22-16, p.2).

Third, the petitioner was advised of his right to call witnesses and present documentary evidence. He chose not to exercise those rights. Fourth, the petitioner was advised of his right to staff representation but declined said right, and finally, the petitioner was provided an impartial decision-maker. In accordance with BOP regulations, the DHO did not act as the reporting official,

investigating officer, UDC member, or witness and did not play a role in referring the charges.[2]

Not only was the petitioner provided all the due process rights required by Wolff, the findings made by the DHO are sufficient to support the finding that the petitioner violated Prohibited Act Code 228. The Supreme Court held in Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 455 (1985) that "[t]he requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." The Supreme Court further stated:

> This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of the witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

In reaching his decision, the DHO considered the reporting officer's statements contained in the Incident Reports, the petitioner's admission that he committed the charge at each hearing, and Dr. Faustino's statement that the petitioner was competent and responsible for his actions. After considering all of the evidence the DHO found that the petitioner had violated Code 228. So long as there is evidence to support the DHO's determination, it must stand. See Superintendent at 455-56. Here, the testimony and documents considered by the DHO clearly provided "some evidence" from which a rational conclusion could be drawn that the petitioner committed the act as charged.

The undersigned recognizes that the petitioner now alleges that he was denied the opportunity to present documentary evidence in the form of his medical records which he maintains would show that he should not be held responsible for his acts of self-mutilation. He also alleges that he was denied a staff representative who could have retrieved his medical records. However, the DHO report

---

[2] See 28 C.F.R. § 541.16(b).

from each of the three hearings clearly indicates that the DHO confirmed that the petitioner did not want to call any witnesses, had no documentary evidence to submit, waived his right to staff representation, and was ready to proceed with the hearing. (Docs. 22-7, p. 2; 22-12, p.2; 22-16, p.2). Furthermore, as previously noted, the DHO relied upon the opinion of Dr. Faustino that the petitioner had "full understanding of his behavior and their consequences," who formulated that opinion with knowledge that the petitioner's medications had been discontinued. Therefore, the petitioner's presentation of his medical records would have been immaterial.

In addition, the petitioner challenges each of the three DHO hearings on the claim that the DHO should have declined to take disciplinary action, but rather, found that he was not competent to participate in the hearing because his medications for treating schizophrenia and bipolar disorder had been discontinued. This argument appears to track the language of 28 C.F.R. § 541.6 which provides as follows:

> If it appears that you are mentally ill at any stage of the disciplinary process, you will be examined by mental health staff.
>
> (a) Competency to Participate in Disciplinary Proceedings. If evidence indicates that you cannot understand the nature of the disciplinary proceedings, or cannot help in your own defense, disciplinary proceedings may be postponed until you are competent to participate. The Unit Disciplinary Committee or Discipline Hearing Officer will make this decision based on evidence, including evidence presented by mental health staff.
> (b) Responsibility for Conduct. You will not be disciplined for conduct committed when, as the result of a severe disease or defect, you were unable to appreciate the nature and quality, wrongfulness of the act. The UDC or DHO will make this decision based on evidence, including evidence presented by mental health staff.

The United States District Court for the District of Massachusetts rejected a claim made pursuant to this regulation in De La Cruz v. Grondolsky, 2012 WL 3059431 (D. Mass. July 27, 2012).

The Court explained its decision as follows:

> The DHO's decision notes that "[a] Responsibility and Competency Evaluation was conducted on you by Psychology staff due to your claims [of being suicidal and depressed] and they found you were responsible for your conduct at the time of incident." Dr. Olden states in an affidavit that "[a]t no time since I began treating Petitioner has he been incompetent. Prior to determining that he was both responsible and competent,, I interviewed Petitioner." The DHO's finding of competency, which is based on Dr. Olden's evaluation and her familiarity with his treatment history is conclusive of the matter.

Id. at *2 (internal citations and footnotes omitted); see also Hatten v. United States, 200 WL 3275182, *3 (D. Or. Oct. 9, 2009)(upholding a DHO decision not to permit inmate to call witnesses to testify regarding his psychological state where DHO relied upon psychologist statement. "This inmate is fully competent and should be held responsible for his actions on October 30, 2008. He is very manipulative and will attempt to avoid personal responsibility for his actions. No mental health issues impacted his functioning or decision making on that specific date."

In the instant matter, the DHO, like the DHO in De La Cruz, relied upon the opinion of mental health staff to conclude that the petitioner was responsible and competent. Specifically, DHO Adduci relied upon the following statement of Dr. Faustino "he is FULLY COMPETENT and has full understanding of his behavior and their consequences. He has been diagnosed with MALINGERING and tends to utilize this malingering behavior to get his demands met." It is critical to note that Dr. Faustino had evaluated the petitioner on September 9, 2011, and September 10, 2011, the two days over which the three incidents of self-mutilation occurred and just a few days before the three DHO hearings. Therefore, as in De La Cruz, the DHO's finding of responsibility and competency, which is based on Dr. Faustino's evaluations of the petitioner and his familiarity with his treatment history, is "conclusive of the matter."

16

## VI. RECOMMENDATION

Based on the foregoing, the undersigned recommends that respondent's Motion to Dismiss, or in the Alternative, for Summary Judgement (Doc. 21) be **GRANTED**, and the petitioner's §2241 petition be **DENIED and DISMISSED WITH PREJUDICE**.

Within fourteen (14) days after being served with a copy of this Recommendation, any party may file with the Clerk of the Court, written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as reflected on the docket sheet. The Clerk of the Court is further directed to prove a copy to all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic case Filing in the United States District Court for the Northern District of West Virginia.

DATED: 6-5-2013

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE